UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
MAREK TRYKACZ,

                **Plaintiff,**                      22-CV-4748 (EK) (SJB)

      -against-                        <u>AMENDED COMPLAINT</u>

BLACKSTONE LABS LLC, PHILLIP BRAUN and
RICHARD NEWTON,
                **Defendants.**
-------------------------------------------------------------------------x

      Plaintiff MAREK TRYKACZ ("Plaintiff"), by and through his undersigned attorneys, as

and for his Amended Complaint herein, following the removal of the action from State Court to

Federal Court, complains of Defendants and alleges as follows:

## PRELIMINARY STATEMENT

1.  Plaintiff commenced this action against Defendants on June 27, 2022 in the Supreme Court

of the State of New York, County of Kings, following which the action was removed to this Court

on August 12, 2022. Plaintiff brings this action against Defendants seeking monetary damages

predicated on Defendants having <u>knowingly</u> sold, marketed and distributed products labelled as

"dietary supplements," including one known as "ANOGENIN," which Defendants <u>knew</u> to be

illegal under Federal Law, and which Defendants <u>knew</u> to contain both undisclosed and illegal

substances, not in the nature of "dietary ingredients."

2.  In doing so, Defendants <u>knowingly</u> defrauded and misled both the FDA and consumers,

callously disregarding health risks and consequences to consumers of their products, and it is a

matter of public record that they did so on a widespread basis, throughout the United States and

internationally, in connection with numerous products, resulting in Defendant BLACKSTONE

LABS LLC ("BLACKSTONE") and Defendant PHILLIP BRAUN ("BRAUN") (among others) being indicted by the Federal Government for Conspiracy to Defraud the FDA, for the Introduction of Unapproved New Drugs Into Interstate Commerce, and Conspiracy to Manufacture and Distribute a Controlled Substance, charges for which it is a matter of public record that Defendant BLACKSTONE and Defendant BRAUN both pleaded <u>GUILTY</u> to Conspiracy to Distribute Controlled Substances and to the Sale of Unapproved New Drugs, and for which Defendant BLACKSTONE also pleaded <u>GUILTY</u> to Conspiracy to Defraud the FDA and to Mail and Wire Fraud. (see U.S. Department of Justice Press Release No. 21-1157 dated November 19, 2021). In pleading GUILTY to such charges, Defendant BLACKSTONE and Defendant BRAUN both <u>expressly</u> <u>admitted</u> that BLACKSTONE had been formed "for the specific purpose of obscuring the sale of products marketed as dietary supplements that were tainted with anabolic steroids and therefore could not lawfully be sold."

3. In the case of the product known as "ANOGENIN," for it to have been legally labelled, marketed, distributed and sold as a "dietary supplement" under Federal Law (including but not limited to the Food, Drug and Cosmetic Act), it had to contain legal "dietary ingredients" and be bereft of illegal substances. However, Defendants illegally labelled, marketed, distributed and sold "ANOGENIN" to consumers, including Plaintiff, as a "dietary supplement" although <u>knowing</u> that it contained <u>undisclosed</u>, <u>illegal</u> and <u>unsafe</u> substances, including a substance/drug known as Metandienone. Indeed, it is a matter of public record that ANOGENIN was among the products seized by the Federal Government from Defendant BLACKSTONE's premises in connection with its prosecution of BLACKSTONE and a number of its executives, among them BRAUN.

4.   Plaintiff, an athlete and internationally ranked weightlifter who was then training for his participation in the Tokyo 2020 Paralympic Games, had purchased on or about August 30, 2018 and used on a daily basis, as per its product labelling, what he understood to be the "dietary supplement" known as ANOGENIN, only to find out, on or about June 13, 2019, that a routine but required urine testing sample taken on April 6, 2019 at the site of the Polish Championships revealed the presence of Metandienone in his system, which is a prohibited and banned substance classified as an Anabolic Androgenic Steroid (AAS) by the World Anti-Doping Agency (WADA).

5.   By reason of having learned that his urine sample had tested positive for the banned substance known as Metandienone, and believing that the presence of Metandienone could only have come from his using the "dietary supplement" known as ANOGENIN, Plaintiff had a sealed container of ANOGENIN in his possession tested by an approved Polish Anti-Doping Testing Laboratory, the results of which testing revealed the presence, in the container of ANOGENIN, of both Metandienone and DHCMT, which substances/drugs are both banned Anabolic Androgenic Steroids (AAS).

6.   As a result of having tested positive for the banned substance known as Metandienone, which banned substance (along with DHCMT) was found to have been present in ANOGENIN, the so-called "dietary supplement" sold, marketed and distributed by Defendant BLACKSTONE, and purchased and used by Plaintiff, Plaintiff seeks to hold Defendants liable to him for all of the damages that he suffered from Defendants' having knowingly sold, marketed and distributed ANOGENIN labelled as a "dietary supplement," which Defendants knew to be illegal under Federal Law, and which Defendants knew to contain both undisclosed and illegal substances, not in the nature of "dietary ingredients."

3

## JURISDICTION AND VENUE

7.   The within action was removed to this Court from the Supreme Court of the State of New York, County of Kings on or about August 12, 2022, at the request of Defendants, pursuant to 28 U.S.C. Section 1441 and by reason of the fact that the Court has original jurisdiction over all of the claims asserted by Plaintiff in the within action, with complete diversity of citizenship among the parties existing and with the amount in controversy exceeding $75,000.00.

## THE PARTIES

8.   Plaintiff MAREK TRYKACZ ("Plaintiff") is a citizen of Poland who resides in Zielona Gora, Poland.

9.   Defendant BLACKSTONE LABS LLC ("BLACKSTONE") is a Florida limited liability company with its principal place of business located at 1120 Holland Dr., Ste 14, Boca Raton, FL. 33487 and, at all times pertinent herein, BLACKSTONE was engaged in the business of selling, marketing and distributing products labelled and marketed as "dietary supplements," and doing so throughout the United States, including New York, and internationally.

10. Defendant PHILLIP BRAUN ("BRAUN") is a resident of Palm Beach County, Florida, he is a Co-Founder of BLACKSTONE and, at all times pertinent herein, he controlled and/or participated in the business operations of BLACKSTONE and its agents in the business of selling, marketing and distributing products labelled and marketed as "dietary supplements," and doing so throughout the United States, including New York, and internationally.

11. Defendant RICHARD NEWTON ("NEWTON") is a resident of the State of Florida and,

at all times pertinent herein, he was BLACKSTONE's Manager and he participated in the business

operations of BLACKSTONE and its agents in the business of selling, marketing and distributing

products labelled and marketed as "dietary supplements," and doing so throughout the United

States, including New York, and internationally.

## THE FACTS

### A.  HISTORY OF THE CASE

12. At all times pertinent herein, Plaintiff was an athlete who competed in Para Powerlifting

sport and is a multiple time representative of Poland in that sport discipline. Plaintiff also competed

in many international championships including but not limited to the 2018 World Para Powerlifting

European Open Championships (1st Place), the 2018 UAE World Cup (4th Place), the 2017 Mexico

World Championships (4th Place), the 2017 Hungary World Cup (2nd Place), the 2017 UAE World

Cup (2nd Place) and the Rio 2016 Paralympic Games (4th Place)[1].

13. At the time that the events at issue herein occurred, Plaintiff was an internationally ranked

Para Powertlifter who was then training for participation in the Tokyo 2020 Paralympic Games.

As such, Plaintiff's performances were very important to him, both personally and economically,

since opportunities to increase his sports sponsorships and product endorsements were dependent

upon his success.

14. On or about August 30, 2018, Plaintiff purchased two (2) containers of a product called

ANOGENIN, which was sold, marketed and distributed by BLACKSTONE as a "dietary

supplement" and the marketing and labelling of which product was represented by

---

[1] https://www.paralympic.org/marek-trykacz (last accessed on October 15, 2021)

BLACKSTONE to "increase metabolism" and "build strength and muscle" while being "plant-based," "natural," "completely legal and safe," not containing any "prohormones and other androgenic products" and "does not increase testosterone levels." The product's labelling, along with its marketing, identified Laxogenin as the primary ingredient, represented to be "natural" and "plant-based," and identified its other ingredients as being limited to: Magnesium Stearate, Silicon Dioxide and Titanium Dioxide.

15. Significantly, the product labeling and its marketing made no mention of and failed to disclose that ANOGENIN contained other substances, including but not limited to Metandienone and DHMCT.

16. Plaintiff consumed BLACKSTONE's product ANOGENIN during the three (3) month period preceding April 6, 2019, consuming 1 capsule per day with meals in accordance with BLACKSTONE's labeling recommendations.

17. On April 6, 2019, at the site of the Polish Championships, in Poland, where Plaintiff was scheduled to compete, Plaintiff was required to submit a urine sample for routine testing. To Plaintiff's surprise and astonishment, Plaintiff learned, on or about June 13, 2019, that the urine testing from April 6, 2019 revealed the presence of Metandienone in Plaintiff's system, which is a prohibited and banned substance classified as an Anabolic Androgenic Steroid (AAS) by the World Anti-Doping Agency (WADA).

18. Due to the results of the urine testing conducted of the sample taken on April 6, 2019, Plaintiff was deemed to have committed "anti-doping violations," as a result of which: he was disqualified by the governing bodies from competing in weightlifting competitions for a period of two (2) years; he was suspended as a member of the Polish National Team; prior results that he had achieved in competitions were nullified; all points, medals and awards that he had previously

received were nullified and forfeited; and the determinations of the Polish Anti-Doping Agency were made public.

19. As a direct result of having been disciplined for Metandienone having been found in his urine sample from April 6, 2019, Plaintiff suffered a loss of income derived from weightlifting-related grants, sponsorships, endorsements, and competitions. Plaintiff also lost the opportunity to profit from his anticipated successful performance in the Tokyo 2020 Paralympics by way of, among other things, additional sponsorships, and other product endorsement opportunities.

20. In addition to the monetary losses suffered by Plaintiff, he also lost the opportunity to compete in the 2020 Paralympics in Tokyo, in numerous other local and international competitions, and he suffered an enormous loss and damage to his reputation as a World-Renowned Para Weightlifting Champion.

21. By reason of having learned that his urine sample had tested positive for the banned substance known as Metandienone, and believing that the presence of Metandienone could only have come from his using the "dietary supplement" known as ANOGENIN, Plaintiff had a sealed container of ANOGENIN that was in his possession tested by an approved Polish Anti-Doping Testing Laboratory in October 2019, the results of which testing revealed the presence, in the container of ANOGENIN, of both Metandienone and DHCMT, which substances/drugs are both banned Anabolic Androgenic Steroids (AAS). Thus, the testing results for ANOGENIN from October 2019 confirmed Plaintiff's suspicion and belief that the source of the banned substance Metandienone found to have been in his urine sample from April 6, 2019 was, and only could have been, from his consumption of BLACKSTONE's product ANOGENIN.

22. On April 8, 2020, Plaintiff, through his attorneys in Poland, gave written notice to Defendant BLACKSTONE of the facts and circumstances relating to his having been disqualified and disciplined by reason of the prohibited substance known as Metandienone having been found in Plaintiff's urine sample from April 6, 2019, as well as about such substance having been found to be present, although undisclosed in its product labelling and marketing, in BLACKSTONE's product known as ANOGENIN, which Plaintiff had consumed in the period leading up to his participation in the Polish Championships, in Poland. In doing so, Plaintiff also provided Defendant BLACKSTONE with copies of (a) the Test Report dated October 31, 2019, performed by an approved Polish Anti-Doping Testing Laboratory, which revealed the presence of Metandienone in BLACKSTONE's product ANOGENIN, and (b) the Decision of the Disciplinary Panel at the Polish Anti-Doping Agency dated November 27, 2019 in which a final determination of penalties and sanctions were imposed on Plaintiff, over his objections, by reason of the presence of Metandienone, a banned Anabolic Androgenic Steroid, in his urine sample from April 6, 2019.

23. Defendant BLACKSTONE failed and refused to respond to Plaintiff's written notice of April 8, 2020.

## B. OVERVIEW OF THE BANNED SUBSTANCE

24. Metandienone, also known as Methandienone or Methandrostenolone, is an androgen and anabolic steroid, and it is a prohibited and banned substance classified as an Anabolic Androgenic Steroid (AAS) by the World Anti-Doping Agency (WADA) on the WADA 2019 Prohibited List, as well as being banned by the United States Anti-Doping Agency, the NCAA and in countries in Western Europe, among them Poland and France.

25. Metandienone is known to bind tightly to and to activate the androgen receptor in order to exert its effects. These effects include dramatic increases in protein synthesis, glycogenolysis, and muscle strength over a short period of time. The drug is an agonist of the androgen receptor, which is the biological target of androgens like testosterone, and it has strong anabolic effects.

26. Metandienone had been marketed under the trade name "Dianabol" (among others) until 1983, when, following pressure from the FDA, it was withdrawn from the United States market by its manufacturer (CIBA). In 1985, generic production of Metandienone was shut down, when the FDA revoked Metandienone's approval authority entirely. In 1990, non-medical use of Metandienone was expressly outlawed in the United States under the Anabolic Steroids Control Act of 1990. Its legal status is that of a Schedule III Controlled Substance in the United States under the Controlled Substance Act.

27. Methandienone used over extended periods of time can result in liver damage from hepatotoxicity without appropriate precautions[2].

28. Methandienone has many androgenic side effects such as increased facial/body hair growth, and estrogenic side effects such as gynecomastia and fluid retention[3]. The drug is also known to be capable of producing severe virilization in women.

---

[2] https://journals.lww.com/acsm-csmr/fulltext/2018/03000/anabolic_steroid_effect_on_the_liver.8.aspx (last accessed on October 15, 2021)
[3] https://www.drugabuse.gov/publications/research-reports/steroids-other-appearance-performance-enhancing-drugs-apeds/what-are-side-effects-anabolic-steroid-misuse (last accessed on October 15, 2021)

29. Scholarly literature supports this conclusion as to Methandienone, finding that

uncontrolled use of Methandienone, its physiological and psychoactive effects raise serious health

implications with possible impact on athletes and doping practices[4] [5].

30. The substance DHCMT Metabolite, dehydrochloromethyl-testosterone metabolite 4α-

chloro-18-nor-17β-hydroxymethyl-17α-methyl-5α-androst-13-en-3α-ol, like Methandienone, is

included on the World Anti-Doping Agency (WADA) 2019 Prohibited List under the

class S1.1A Exogenous Anabolic Androgenic Steroids.

31. At no time did Plaintiff knowingly ingest or consume Metandienone or DHCMT.

32. Rather, the source of the Metandionone found in Plaintiff's urine sample from April 6,

2019 has been determined, as a result of testing performed of BLACKSTONE's product

ANOGENIN, to be Plaintiff's consumption of ANOGENIN during the three (3) months preceding

the April 6, 2019 urine sample, which product ANOGENIN was found to contain Metandionone

(along with DHCMT).

## C. BLACKSTONE'S PRODUCT ANOGENIN

33. On or about August 30, 2018, Plaintiff purchased two (2) containers of a product called

ANOGENIN, which was sold, marketed and distributed by BLACKSTONE as a "Dietary

Supplement" and the marketing and labelling of which product was represented by

BLACKSTONE to "increase metabolism" and "build strength and muscle" while being "plant-

---

[4] https://pubmed.ncbi.nlm.nih.gov/125133/ (last accessed on October 14, 2021)
[5] https://www.betterhealth.vic.gov.au/health/healthyliving/steroids#long-term-effects-of-anabolic-steroids (last accessed on October 15, 2021)

based," "natural," "completely legal and safe," not containing any "prohormones and other androgenic products" and "does not increase testosterone levels."

34. The product's labelling, along with its marketing, identified Laxogenin as the primary ingredient, represented to be "natural" and "plant-based," and identified its other ingredients as being limited to: Magnesium Stearate, Silicon Dioxide and Titanium Dioxide.[6]

35. Significantly, the product labeling and its marketing made no mention of and failed to disclose that ANOGENIN contained other substances, including but not limited to the banned substance/drug known as Metandienone.

36. On BLACKSTONE's website, Defendant BRAUN stated and represented that

ANOGENIN: "doesn't affect natural testosterone production (meaning there's no need for post cycle therapy), but will significantly increase strength, power, performance, and body composition in as little as 2-3 weeks! Natty or not, Anogenin belongs in any muscle-building stack".[7]

37. Defendants stated and represented on their website the following untrue and misleading statement regarding ANOGENIN: "Every hard-training athlete wants to make gains in their performance and physique, but not every athlete wants to jump headfirst into the world of anabolics, where the rewards are monumental, but so are the risks. Blackstone Labs realizes that all athletes want to build muscle and increase performance and have created the ultimate all-natural muscle building supplement in Anogenin. Anogenin is a non-hormonal muscle builder to enhance strength, recovery, and lean muscle mass as well as decrease body fat levels. Anogenin is perfect

---

[6] https://blackstonelabs.com/products/anogenin (last accessed on October 14, 2021)
[7] *Id.*

for men and women as it won't affect your hormone levels but will significantly enhance your performance and physique"[8].

38. On BLACKSTONE's website, Defendant BRAUN stated and represented that

ANOGENIN is "anabolic and non-hormonal so you will build muscle slow and steady, it's a nutrient partitioner so if you are eating a proper diet you are going to utilize those calories lot better", "it is also anti-cortisol", "it has positive effects on estrogen too", "very safe product for anyone".[9]

### D. **THE HISTORY OF BLACKSTONE'S ILLICIT BUSINESS PRACTICES**

39. Defendants have a history of having <u>knowingly</u> defrauded and misled both the FDA and consumers, callously disregarding health risks and consequences to consumers of their products, and it is a matter of public record that they did so on a widespread basis, throughout the United States and internationally, in connection with numerous products, resulting in Defendant BLACKSTONE and Defendant BRAUN ("BRAUN"), among others, being indicted by the Federal Government for Conspiracy to Defraud the FDA, for the Introduction of Unapproved New Drugs Into Interstate Commerce and Conspiracy to Manufacture and Distribute a Controlled Substance, charges for which it is a matter of public record that Defendant BLACKSTONE and Defendant BRAUN both pleaded <u>GUILTY</u> to Conspiracy to Distribute Controlled Substances and to the Sale of Unapproved New Drugs, and for which Defendant BLACKSTONE also pleaded <u>GUILTY</u> to Conspiracy to Defraud the FDA and to Mail and Wire Fraud. (see U.S. Department of Justice Press Release No. 21-1157 dated November 19, 2021). In pleading GUILTY to such

---

[8] *Id.*
[9] *Id.*

charges, Defendant BLACKSTONE and Defendant BRAUN both expressly admitted that BLACKSTONE had been formed "for the specific purpose of obscuring the sale of products marketed as dietary supplements that were tainted with anabolic steroids and therefore could not lawfully be sold."

40. In their respective Factual Offers of Proof in Support of Guilty Plea, Defendant BLACKSTONE and Defendant BRAUN both expressly admitted, in pertinent part, that as to their business practices:

A. BLACKSTONE was formed by Defendant BRAUN (and one or more other co-conspirators) for the specific purpose of obscuring the sale of products marketed as "dietary supplements" that were, in fact, tainted with anabolic steroids and, therefore, could not lawfully be sold;

B. BLACKSTONE, through its executives, including BRAUN, and its employees, knowingly conspired to defraud the FDA and to defraud consumers;

C. BLACKSTONE, through its executives, including BRAUN, and its employees, knowingly sold and directed others to sell unapproved new drugs, with the intent to defraud or mislead, in violation of the Food, Drug and Cosmetic Act;

D. BLACKSTONE advertised its illegal products on the internet and through email and social media, falsely representing to customers that the company's products were "legal" and were "dietary supplements;"

E. Email advertising was a major component of BLACKSTONE's sales, and that the marketing emails repeatedly falsely claimed that "All of our products are manufactured in FDA approved, registered and inspected facility that maintains GMP [Good Manufacturing Practices] certification and follows all FDA guidelines."

F.   BLACKSTONE, through its executives, including BRAUN, and its employees, knew these statements to consumers were false, and were intended to convince consumers to buy BLACKSTONE's products;

G.   BLACKSTONE'S advertisements falsely stated that "Our pro-anabolic compounds are all third party independently lab tested before encapsulation," when BLACKSTONE and BRAUN knew that BLACKSTONE's manufacturers were not, in fact, testing the raw ingredients before encapsulation;

H.   BRAUN knew that there were risks to consumers taking BLACKSTONE's steroid products but nevertheless, and with the full understanding of the potential harm its products could cause to consumers, BRAUN and BLACKSTONE distributed the illegal and dangerous products throughout the United States.

41. The prosecution of BLACKSTONE and BRAUN (and their co-conspirators) was the result of the Government having concluded that, since 2012, BLACKSTONE and BRAUN (and their co-conspirators) had engaged in a sophisticated scheme and pattern of conduct to market, promote and sell illegal products labeled as "dietary supplements" and under the guise of their being "safe" and "legal." ANOGENIN is one of such illegal products.

42. The Government concluded that BLACKSTONE and BRAUN (and their co-conspirators) had distributed illegal steroids, synthetic stimulants, mind-altering chemicals, and other muscle-building products, to all 50 states, and outside the United States as well, through their fraudulent scheme.

14

43. The Government concluded that BLACKSTONE and BRAUN (and their co-conspirators) avoided scrutiny by deceit and by shifting their sales to new unapproved or unsafe products to sustain their business and income.

44. On or about April 24, 2015, the FDA sent a "WARNING LETTER" to BLACKSTONE by reason of BLACKSTONE's labeling, marketing and sale of its product called "Angel Dust" as a "dietary supplement" which was found by the FDA to contain illegal ingredients and substances and to have been illegally introduced into interstate commerce. The WARNING LETTER issued to BLACKSTONE included the following:

> "We request that you take prompt action to correct the violations cited above, as well as any other violations associated with your Angel Dust product **or other dietary supplement products marketed by your firm**, including any that contain DMBA. **We also remind you that the new dietary ingredient notification requirement applies to all dietary supplements that contain new dietary ingredients that have not been present in the food supply as articles used for food in a form in which the food has not been chemically altered. It is your responsibility to ensure that your firm complies with all requirements of federal law and FDA regulations."**

## COUNT I

### Breach of Implied Warranty of Merchantability

45. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-44 of this Amended Complaint with the same force and effect as of set forth at length herein.

46. Defendant BLACKSTONE is a manufacturer, marketer, distributor, promoter and seller of products offered for sale to the public and labelled as "Dietary Supplements."

47. One of the products manufactured, marketed, distributed, promoted and sold to consumers and labelled as a "Dietary Supplement" by Defendants is the product known as ANOGENIN.

48. Although manufactured, marketed, distributed, promoted, sold and labelled by Defendants as a "Dietary Supplement," and it is represented by Defendants to be "safe," "legal," "natural" and "plant-based," in reality ANOGENIN is neither a "Dietary Supplement" nor is it "safe" or "legal."

49. Rather, ANOGENIN does not meet the definition of a "Dietary Supplement" under the FDCA and it contains an undisclosed, illegal, unsafe substance and drug by the name of METANDIENONE, which is an illegal Anabolic Androgenic Steroid (AAS) and a Schedule III Controlled Substance.

50. Plaintiff purchased ANOGENIN on or about August 30, 2018, and consumed it, in reliance upon Defendants' product labeling and representations that the product was a "Dietary Supplement," that it was "safe" and "legal" and that all of its ingredients were disclosed in the labelling, as required by law.

51. Plaintiff purchased and consumed ANOGENIN in reliance upon Defendants' skill, judgment and representations, and in reliance upon the implied warranties of merchantability and fitness for its intended use as a "Dietary Supplement."  BUT FOR Defendants' representations regarding the labelling, safety, purity, appropriateness, and quality of ANOGENIN, Plaintiff would never have purchased or consumed it.

52. Defendants breached the implied warranties of merchantability and fitness for its intended purpose as a "Dietary Supplement" in that: ANOGENIN is not a "Dietary Supplement;" it is not "safe" or "legal;" it cannot be used "safely" as directed by Defendants; it had a deceptively

false description and labelling; it could not pass without objection in the trade as to either its description or its ingredients; and it contains an undisclosed, illegal and unsafe drug and substance.

53. As a direct and proximate cause of Defendants' breach of implied warranties of merchantability and fitness for its intended purpose as a "Dietary Supplement," Plaintiff has been injured and harmed because he would neither have purchased nor consumed ANOGENIN but for Defendants' deception and misrepresentations as to the product's description, its ingredients, its fitness for use as a "Dietary Supplement," its being "safe" and "legal" and its containing only "natural" and "plant-based" ingredients.

54. As a direct and proximate cause of Defendants' breach of the implied warranties of merchantability and fitness for its intended purpose as a "Dietary Supplement," Plaintiff has been damaged because ANOGENIN has been found and determined to contain an illegal and unsafe and undisclosed substance/drug known as METANDIENONE, which is an illegal Anabolic Androgenic Steroid (AAS) and a Schedule III Controlled Substance, as a result of which METANDIENONE was found to be present in a urine sample taken from Plaintiff on April 6, 2019, following his having consumed ANOGENIN during the three (3) month period leading up to April 6, 2019, resulting in dire financial and other consequences for Plaintiff, an accomplished and world-renowned athlete, including suspension from competitive events, the forfeiture of previous results and awards, monetary losses, damage to reputation, loss of endorsements, loss of scholarships and lost earning capacity.

55. Plaintiff sustained damages as a direct and proximate result of Defendants' breaches of the implied warranties of merchantability and fitness for its intended purpose as a "Dietary Supplement" in regard to ANOGENIN in an amount to be determined at trial but reasonably believed to exceed $400,000.00 ($100,000.00 per annum for 2019-2022) and continuing.

## COUNT II

### Failure to Warn

56. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-55 of this Amended Complaint with the same force and effect as of set forth at length herein.

57.  Defendants knew of the dangers posed by its product, ANOGENIN.

58. Defendants had a duty to warn consumers, among them Plaintiff, of the dangers related to ANOGENIN.

59. Defendants were negligent in relation to fulfilling their duty to warn consumers of ANOGENIN. Defendants' failure to warn consumers of the dangers of ANOGENIN resulted in injury to Plaintiff in regard to ANOGENIN in an amount to be determined at trial but reasonably believed to exceed $400,000.00 ($100,000.00 per annum for 2019-2022) and continuing.

## COUNT III

### Fraud

60. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-59 of this Amended Complaint with the same force and effect as of set forth at length herein.

61. Defendants have marketed, distributed and sold the product ANOGENIN as a "Dietary Supplement" with full knowledge that it does not, in fact, constitute a "Dietary Supplement" under the FDCA.

62. Defendants have willfully misrepresented ANOGENIN to be a "Dietary Supplement."

63. Defendants have willfully misrepresented ANOGENIN to be a "legal" and "safe" product.

64. Defendants have willfully misrepresented ANOGENIN to contain only "natural" and "plant-based" ingredients.

65. Defendants have willfully failed to disclose the presence in ANOGENIN of the illegal drug known as METANDIENONE, which is an illegal Anabolic Androgenic Steroid (AAS) and a Schedule III Controlled Substance.

66. Defendants have willfully failed to disclose the inherent health risks and dangers associated with METANDIENONE.

67. Defendants falsely market the company's products, among them ANOGENIN, as cutting-edge dietary supplements, designed to safely promote muscle growth and strength, and enhance physical and mental performance.

68. Defendants advertise illegal products on the internet and through email and social media, falsely misrepresenting to customers that the company's products are legal and are dietary supplements.

69. Defendants knew about the dangers associated with using METANDIENONE and nonetheless intentionally failed to comply with the FDCA and other applicable regulations.

70. Plaintiff would neither have purchased nor consumed ANOGENIN during the three (3) month period leading up to his urine sample on April 6, 2019 BUT FOR all of Defendants' purposefully false and misleading misrepresentations in regard to ANOGENIN being a "Dietary

Supplement," "safe", "legal," "natural," "plant-based" and as to all of its ingredients having been identified and disclosed in its labelling and marketing.

71. The false and misleading statements and misrepresentations in regard to ANOGENIN were made by Defendants with knowledge of their falsehood.

72. The false and misleading representations were made by Defendants, upon which Plaintiff reasonably and justifiably relied and were intended to induce and did induce Plaintiff to purchase and consume ANOGENIN.

73. Defendants' purposefully misleading and deceptive practices caused harm to Plaintiff.

74. As a direct and proximate result of the fraudulent conduct on the part of Defendants, Plaintiff suffered a loss of income derived from weightlifting-related grants, sponsorships, endorsements, and competitions. Plaintiff also lost the opportunity to profit from his anticipated successful performance in the Tokyo 2020 Paralympics by way of, among other things, additional sponsorships, and other product endorsement opportunities. In addition to the monetary losses suffered by Plaintiff, he also lost the opportunity to compete in the 2020 Paralympics in Tokyo, in numerous other local and international competitions, and he suffered an enormous loss and damage to his reputation as a World-Renowned Para Weightlifting Champion.

75. Plaintiff sustained damages as a direct and proximate result of Defendants' fraudulent conduct and behavior, without regard to and with indifference for the consequences of such conduct and behavior on consumers of their illegal and unsafe products, among them ANOGENIN.

76. The Defendants' conduct, as described and detailed above, much of which Defendants BLACKSTONE and BRAUN have admitted to as part and parcel to pleading <u>guilty</u> in their criminal prosecution, demonstrates a high degree of moral culpability as well as being willful, wanton, reckless and/or malicious on their part. Both BLACKSTONE and BRAUN pleaded guilty to Conspiracy to Distribute Controlled Substances and to the Sale of Unapproved New Drugs, and BLACKSTONE also pleaded <u>GUILTY</u> to Conspiracy to Defraud the FDA and to Mail and Wire Fraud. (see U.S. Department of Justice Press Release No. 21-1157 dated November 19, 2021). In pleading GUILTY to such charges, Defendant BLACKSTONE and Defendant BRAUN both <u>admitted</u> that BLACKSTONE had been formed "for the specific purpose of obscuring the sale of products marketed as dietary supplements that were tainted with anabolic steroids and therefore could not lawfully be sold."

77. Moreover, in their respective Factual Offers of Proof in Support of Guilty Plea, Defendant BLACKSTONE and Defendant BRAUN both <u>admitted</u>, in pertinent part, that as to their business practices:

A. BLACKSTONE was formed by Defendant BRAUN (and one or more other co-conspirators) for the specific purpose of obscuring the sale of products marketed as "dietary supplements" that were, in fact, tainted with anabolic steroids and, therefore, could not lawfully be sold;

B. BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knowingly</u> conspired to <u>defraud</u> the FDA and to defraud consumers;

C.  BLACKSTONE, through its executives, including BRAUN, and its employees, knowingly sold and directed others to sell unapproved new drugs, with the intent to defraud or mislead, in violation of the Food, Drug and Cosmetic Act;

D.  BLACKSTONE advertised its illegal products on the internet and through email and social media, falsely representing to customers that the company's products were "legal" and were "dietary supplements;"

E.  Email advertising was a major component of BLACKSTONE's sales, and that the marketing emails repeatedly falsely claimed that "All of our products are manufactured in FDA approved, registered and inspected facility that maintains GMP [Good Manufacturing Practices] certification and follows all FDA guidelines."

F.  BLACKSTONE, through its executives, including BRAUN, and its employees, knew these statements to consumers were false, and were intended to convince consumers to buy BLACKSTONE's products;

G.  BLACKSTONE'S advertisements falsely stated that "Our pro-anabolic compounds are all third party independently lab tested before encapsulation," when BLACKSTONE and BRAUN knew that BLACKSTONE's manufacturers were not, in fact, testing the raw ingredients before encapsulation; and

H.  BRAUN knew that there were risks to consumers taking BLACKSTONE's steroid products but nevertheless, and with the full understanding of the potential harm its products could cause to consumers, BRAUN and BLACKSTONE distributed the illegal and dangerous products throughout the United States.

78. Due to the results of the urine testing conducted of the sample taken on April 6, 2019, the results of which were revealed to Plaintiff on or about June 13, 2019, Plaintiff was deemed to have committed anti-doping violations, as a result of which: he was disqualified by the governing bodies from competing in weightlifting competitions for a period of two (2) years; he was suspended as a member of the Polish National Team; prior results that he had achieved in competitions were nullified; all points, medals and awards that he had previously received were nullified and forfeited; and the determinations of the Polish Anti-Doping Agency were made public.

79. As a direct and proximate result of the acts and omissions of Defendants, Plaintiff suffered a loss of income derived from weightlifting-related grants, sponsorships, endorsements, and competitions. Plaintiff also lost the opportunity to profit from his anticipated successful performance in the Tokyo 2020 Paralympics by way of, among other things, additional sponsorships, and other product endorsement opportunities. In addition to the monetary losses suffered by Plaintiff, he also lost the opportunity to compete in the 2020 Paralympics in Tokyo, in numerous other local and international competitions, and he suffered an enormous loss and damage to his reputation as a World-Renowned Para Weightlifting Champion.

80. Plaintiff sustained damages as a direct and proximate result of Defendants' morally culpable and willful, wanton, reckless and malicious behavior without regard to and with indifference for the consequences of such conduct and behavior on consumers of their illegal and unsafe products, among them ANOGENIN, which conduct on the part of Defendants does not merely approach criminality, but by Defendants' own admissions, does in fact constitute criminality, thereby warranting an award of Punitive Damages in this case.

81. By reason of the fraudulent, morally culpable, willful, reckless, wanton and malicious conduct on the part of Defendants, as to which Defendants have heretofore admitted in their criminal prosecution, in addition to compensatory damages in an amount to be determined at trial but reasonably believed to exceed $400,000.00 ($100,000.00 per annum for 2019-2022) and continuing, Plaintiff is also entitled to an award of Punitive Damages against Defendants for the purpose of punishing Defendants for their exceedingly reprehensible behavior and conduct and to deter Defendants, and others in their industry, from repeating such behavior and conduct in the future, in an amount to be determined at trial but reasonably believed to exceed $500,000.00.

## COUNT IV

### Magnuson-Moss Warranty Act, 15 U.S.C. §§2301, et seq.

82. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-81 of this Amended Complaint with the same force and effect as of set forth at length herein.

83. Supplements are "consumer products" under 15 U.S.C. § 2301(1).

84. Plaintiff is a "consumer" under 15 U.S.C. § 2301(3).

85. Defendant is a "supplier" under 15 U.S.C. § 2301(4).

86. Defendant is a "warrantor" under 15 U.S.C. § 2301(5).

87. Supplements sold by Defendants, among them ANOGENIN, did not conform to the

Express Warranties made by Defendants because, in fact, Defendants marketed, distributed and sold adulterated Supplements, among them ANOGENIN, rather than unadulterated Supplements as Defendant expressly warranted.

88. By reason of Defendants' breach of warranties, Defendants violated the statutory rights due Plaintiff under Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.,* thereby damaging Plaintiff.

89. Plaintiff was injured as a direct and proximate result of Defendants' breach because he would not otherwise have purchased the adulterated Supplement ANOGENIN if he knew the truth about the product marketed, distributed and sold by BLACKSTONE.

90. Plaintiff would neither have purchased nor consumed ANOGENIN during the three (3) month period leading up to his urine sample on April 6, 2019 BUT FOR all of Defendants' purposefully false and misleading misrepresentations in regard to ANOGENIN being a "Dietary Supplement," "safe", "legal," "natural," "plant-based" and as to all of its ingredients having been identified and disclosed in its labelling and marketing.

91. Plaintiff, to his detriment, consumed the adulterated Supplement ANOGENIN, sold by BLACKSTONE, so it would be futile to afford BLACKSTONE any opportunity to try to cure its failure to comply with its obligations under its written or implied warranty.

92. Within a reasonable time after discovering BLACKSTONE's breaches of warranty, Plaintiff, through his attorney, acting on his behalf, gave written notice to BLACKSTONE of the breaches of warranty alleged herein.

93. By reason of the foregoing violations of the Magnuson-Moss Warranty Act on the part of Defendants in regard to ANOGENIN, Plaintiff is entitled to be awarded all damages authorized under such statute.

## COUNT V

### Violation of N.Y. Gen. Bus. Law §349

94. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-93 of this Amended Complaint with the same force and effect as of set forth at length herein.

95. BLACKSTONE engaged in deceptive consumer practices in connection with its sale and delivery of adulterated Supplements, among them ANOGENIN, which it falsely identified as a "natural," safe" and "legal" "Dietary Supplement," in violation of New York General Business Law § 349.

96. Plaintiff seeks to enjoin the unlawful practices described herein, and to recover his actual damages and reasonable attorney's fees.

97. BLACKSTONE's acts and practices in violation of New York General Business Law Section 349 were likely to and, in fact, did mislead consumers, including Plaintiff, acting reasonably under the circumstances.

98. BLACKSTONE's false representations and warranties concerning the nature and quality of the Supplement ANOGENIN purchased by Plaintiff were materially misleading because the Supplement that BLACKSTONE sold contained illegal substances and drugs.

99. BLACKSTONE's false representations and warranties concerning the nature and quality of the Supplement ANOGENIN purchased by Plaintiff had an adverse impact in consumers at large because those representations and warranties were directed to thousands of BLACKSTONE's customers over a number of years.

100.    BLACKSTONE's conduct in selling adulterated Supplements to consumers in the United States and abroad, among them ANOGENIN, had an adverse impact on Plaintiff and consumers at large because those representations and warranties were directed to millions of BLACKSTONE's customers over a number of years.

101.    Plaintiff has been injured as a direct result of BLACKSTONE's actions and practices in violation of New York General Business Law Section 349 because he was misled into purchasing the adulterated Supplement ANOGENIN.

102.    By reason of such violations of Gen. Bus. Law §349, Plaintiff has been injured and suffered actual damages in a sum to be determined at trial.

## Count VI

### Unjust Enrichment, Deceptive Practices and False Advertisement

103.    Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-102 of this Amended Complaint with the same force and effect as of set forth at length herein

104.    BLACKSTONE and its agents, by selling adulterated Supplements, among them ANOGENIN, committed wrongful and deceptive acts and, in doing so, were unjustly enriched and caused financial and reputational harm to Plaintiff.

105.  Selling adulterated Supplements on the part of BLACKSTONE was an act done with an immoral purpose and BLACKSTONE and its agents had knowledge that the deceptive and wrongful acts which were being committed exceeded the authority of the persons committing the acts and that they were in violation of the law.

106.  BLACKSTONE and its agents were aware that they had a duty to sell unadulterated, legal and safe Supplements to consumers, including Plaintiff, with ANOGENIN being among such products, and instead they intentionally failed to meet this obligation in that BLACKSTONE and its agents knew that ANOGENIN contained Metandienone, an ingredient that not only was not disclosed in its marketing and labelling, but which is an illegal and unsafe drug that had no business having been included in a so-called "Dietary Supplement."

## COUNT VII

### Personal Liability on the Part of Defendant BRAUN

107. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-106 of this Amended Complaint with the same force and effect as of set forth at length herein

108. Defendant BRAUN is a Co-Founder of BLACKSTONE and, at all times pertinent herein, he controlled and/or participated in the business operations of BLACKSTONE and its agents in the business of selling, marketing and distributing products labelled and marketed as "dietary supplements," and doing so throughout the United States and internationally.

109. In their respective Factual Offers of Proof in Support of Guilty Plea, Defendant BLACKSTONE and Defendant BRAUN both <u>admitted</u>, in pertinent part, that as to their business practices:

A. BLACKSTONE was formed by Defendant BRAUN (and one or more other co-conspirators) for the specific purpose of obscuring the sale of products marketed as "dietary supplements" that were, in fact, tainted with anabolic steroids and, therefore, could not lawfully be sold;

B. BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knowingly</u> conspired to defraud the FDA and to defraud consumers;

C. BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knowingly</u> sold and directed others to sell unapproved new drugs, with the intent to defraud or mislead, in violation of the Food, Drug and Cosmetic Act;

D. BLACKSTONE advertised its illegal products on the internet and through email and social media, falsely representing to customers that the company's products were "legal" and were "dietary supplements;"

E. Email advertising was a major component of BLACKSTONE's sales, and that the marketing emails repeatedly falsely claimed that "All of our products are manufactured in FDA approved, registered and inspected facility that maintains GMP [Good Manufacturing Practices] certification and follows all FDA guidelines."

F. BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knew</u> these statements to consumers were false, and were intended to convince consumers to buy BLACKSTONE's products;

G. BLACKSTONE'S advertisements falsely stated that "Our pro-anabolic compounds are all third party independently lab tested before encapsulation," when BLACKSTONE and BRAUN <u>knew</u> that BLACKSTONE's manufacturers were not, in fact, testing the raw ingredients before encapsulation; and

H. BRAUN <u>knew</u> that there were risks to consumers taking BLACKSTONE's steroid products but nevertheless, and with the full understanding of the potential harm its products could cause to consumers, BRAUN and BLACKSTONE distributed the illegal and dangerous products throughout the United States.

110.  On BLACKSTONE's website, Defendant BRAUN stated and misrepresented that ANOGENIN: "doesn't affect natural testosterone production (meaning there's no need for post cycle therapy), but will significantly increase strength, power, performance, and body composition in as little as 2-3 weeks! Natty or not, Anogenin belongs in any muscle-building stack."

111. On BLACKSTONE's website, Defendant BRAUN stated and misrepresented that ANOGENIN is "anabolic and non-hormonal so you will build muscle slow and steady, it's a nutrient partitioner so if you are eating a proper diet you are going to utilize those calories lot better", "it is also anti-cortisol", "it has positive effects on estrogen too", "very safe product for anyone".

112.  Defendant BRAUN directly profited from his organization of, participation in and control over the pattern and business model of deceptive and illegal actions taken by BLACKSTONE as enumerated above.

113.    By reason of the foregoing, Defendant BRAUN is personally liable to Plaintiff for all damages sustained as a consequence of BRAUN's organization of, participation in, and direction and control over, the pattern and business model of deceptive and illegal actions taken by BLACKSTONE as enumerated herein, and for which BRAUN has pleaded guilty to having been a key leader of and participant in the criminal conspiracy to deceive and mislead both the FDA and consumers, among them Plaintiff, into purchasing its products, among them ANOGENIN, in all 50 states and internationally, and based on having knowingly misrepresented its products, among them ANOGENIN, to be a "dietary supplement," to be " safe" and "legal," and to not contain any undisclosed or illegal drugs or substances.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court enter judgment against All Defendants as follows:

a)  General Compensatory Damages in an amount consistent with the allegations contained herein and to be proven at trial, reasonably believed to exceed $400,000.00 ($100,000.00 per annum for 2019-2022) and continuing;

b)  Special Damages in an amount consistent with the allegations contained herein and to be proven at trial;

c)  Punitive Damages in an amount consistent with the allegations contained herein and to be proven at trial;

d) Reasonable Attorney's Fees, where applicable, in an amount consistent with the allegations contained herein and to be proven at trial,

e) Costs of suit incurred herein, and that Plaintiff be awarded such other costs and relief as the court deems just and equitable,

f) Investigative costs and expenses,

g) Both pre- and post-judgment interest on any amounts awarded.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a trial by jury on all issues so triable.

Dated: Brooklyn, New York

January 26, 2023

Respectfully submitted,

SABAJ LAW, P.C.

By: <u>s/s *Paul T. Sabaj*</u>

Paul T. Sabaj
121A Nassau Ave
Brooklyn, New York 11222
Tel.: (212)-518-8270
Fax: (888)-589-5514